U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 AUG 11  AM 11: 52

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

BRIAN J. KEARNEY,                                )
                                                 )
        Plaintiff,                               )
                                                 )
    v.                                           )      Case No. 5:15-cv-00166
                                                 )
OKEMO LIMITED LIABILITY                          )
COMPANY, d/b/a Okemo Mountain Resort,            )
and THE UNITED STATES SKI AND                    )
SNOWBOARD ASSOCIATION,                           )
                                                 )
        Defendants.                              )

**OPINION AND ORDER RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(Doc. 58)**

Plaintiff Brian J. Kearney brings this personal injury action against Defendants Okemo Limited Liability Company, doing business as Okemo Mountain Resort, and the United States Ski and Snowboard Association ("USSA"), alleging negligent installation of safety netting during a downhill alpine ski race in February 2015. Defendants seek summary judgment on the ground that Plaintiff signed a release prior to his participation in the race. The court heard argument on Defendants' Motion on July 25, 2016. For the reasons discussed below, Defendants' Motion for Summary Judgment (Doc. 58) is DENIED.

**Background**

The court considers only those facts relevant to the pending motion.

Plaintiff was seriously injured while competing in an amateur downhill ski race at Okemo Mountain Resort ("Okemo") in Ludlow, Vermont in February 2015. USSA sanctioned the competition. To be eligible to participate, individuals had to have a USSA membership and proper ski equipment. Participants also had to conduct a visual inspection of the course and take at least two official training runs prior to the race.

1

Plaintiff became a USSA member on December 16, 2014 for the 2014-2015 ski season through USSA's website.   As part of the USSA membership registration process, registrants were required to acknowledge and agree to be bound by the terms of USSA's Assumption of Risk and Release of Liability agreement (the "release").   (Doc. 61-16 at 10–11.)

The release contained the following exculpatory provision:

> Member hereby unconditionally WAIVES AND RELEASES ANY AND ALL CLAIMS, AND AGREES TO HOLD HARMLESS, DEFEND AND INDEMNIFY USSA FROM ANY CLAIMS, present or future, to Member or his/her property, or to any other person or property, for any loss, damage, expensive, or injury (including DEATH), suffered by any person from or in connection with Member's participation in any Activities in which USSA is involved in any way, due to any cause whatsoever, INCLUDING NEGLIGENCE and/or breach of express or implied warranty on the part of USSA.

(Doc. 58-5 at 2.)   As used in the release, "USSA" referred to USSA and "its subsidiaries, affiliates, officers, directors, volunteers, employees, coaches, contractors and representatives, local ski clubs, competition organizers and sponsors, and ski and snowboard facility operators." (*Id.*)   The term "Activities" included "skiing and snowboarding in their various forms, as well as preparation for participation in, coaching, volunteering, officiating and related activities in alpine, nordic, freestyle, adaptive, and snowboarding competitions and clinics." (*Id.*)   The release also contained a choice-of-law provision, which stated that it would be "construed in accordance with, and governed by the substantive laws of the State of Colorado, without reference to principles governing choice or conflict of laws." (*Id.*)

## Analysis

### I.     Summary Judgment Standard

A party is entitled to summary judgment when it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute over a "material fact" is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*   A party opposing a properly pleaded summary judgment motion "may not rest upon mere allegation or denials of his pleading, but must set forth specific

facts showing that there is a genuine issue for trial." *Id.* at 256 (citations omitted). If the nonmovant offers evidence that "is merely colorable, or is not significantly probative, summary judgment may be granted," *id.* at 249–50 (citations omitted), but "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994) (citation omitted).

## II.   Plaintiff's Acceptance of Click-Wrap Release

The type of release at issue in this case is commonly referred to as a "click-wrap" agreement.[1] *See Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (leading case discussing click-wrap agreements). Courts routinely find these types of agreements enforceable. *See id.* at 236–43; *see also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 837 (S.D.N.Y. 2012); *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 377–78 (S.D.N.Y. 2010). Because the click-wrap technology does not permit the customer to continue to use the website unless he or she clicks on the required box on the screen, courts have accepted proof of use at the site as evidence of the customer's agreement. *See Feldman*, 513 F. Supp. 2d at 232–33, 235; *Fteja*, 841 F. Supp. 2d at 834–35, 841.

Plaintiff admits that he applied for a USSA membership online, but states that he has no recollection of seeing or acknowledging the release. (Doc. 61-27 at ¶ 11.) He attempts to create a factual dispute by asserting that Defendants have yet to produce a release signed or initialed by him. However, unlike when a person physically signs a paper contract, such documentation does not necessarily exist in the click-wrap context. (*See* Doc. 61-16 at 27 (noting that screenshot images for each step of membership process are not saved in USSA's computer database).) Nevertheless, courts frequently enforce such agreements. For example, in *Feldman*, the plaintiff challenged the validity of a forum selection clause in an electronic click-wrap agreement. 513 F. Supp. 2d at 231. In support of the agreement's enforceability, the defendant relied upon an affidavit from an information technology representative familiar with the steps that the plaintiff

---

[1] Click-wrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *United States v. Drew*, 259 F.R.D. 449, 462 n.22 (C.D. Cal. 2009) (citation omitted).

would have needed to go through in order to create the online account that plaintiff indisputably had created. *See id.* at 232–33. The representative testified that in order to complete the account sign-up process, the plaintiff would have been required to accept certain terms and conditions by checking a "Yes, I agree" box. *See id.* If plaintiff had failed to check this box, he would not have been able to complete his application, activate his account, or incur charges. *See id.* The representative testified that plaintiff did activate his account and had incurred charges, and the court found this evidence sufficient to authenticate the click-wrap agreement. *See id.* at 232–33. 235; *see also Fteja*, 841 F. Supp. 2d at 831, 834–35, 841 (to counter plaintiff's argument that there was no proof he agreed to forum selection clause, defendant offered similar evidence showing that plaintiff was Facebook user and could not have become one unless agreeing to Facebook's terms of use ).

Here, USSA's information technology representative and software developer, Dana Alexandrescu, was deposed and offered testimony regarding USSA's online membership process and Plaintiff's application. Ms. Alexandrescu testified that she has been familiar with USSA's website and the online membership process since its inception in 2008. She produced demonstrative exhibits of the release currently in use by USSA and testified that the same agreement has been used in USSA's online membership process since 2008. All online registrants since 2008 have been required to read and acknowledge the release by checking a box that states, "I HAVE CAREFULLY READ THE FOREGOING AND UNDERSTAND IT TO BE A LEGALLY BINDING RELEASE AND INDEMNITY AGREEMENT." (Doc. 61-16 at 10; Doc. 61-17 at 13.) Ms. Alexandrescu testified that the USSA website has never permitted a registrant to become a USSA member without checking this box. If a registrant were to not agree to the release and leave the box unchecked, the page with the release would continuously reload and prompt the registrant to check the box. Only after checking the box would the registrant be permitted to complete the membership process.[2] Upon completion of the process, the registrant receives a confirmation receipt, welcome letter, and USSA membership number.

_____

[2] Plaintiff attempts to argue that an individual could choose to not accept the terms of the release and still become a USSA member, basing his argument on a demonstrative exhibit provided at Ms. Alexandrescu's deposition. The exhibit consisted of a screenshot of the online enrollment process captured prior to the "I agree" box being checked. (*See* Doc. 61-17 at 13.) It shows the application as Plaintiff would have seen it *before* he clicked on the box to demonstrate his

It is undisputed that Plaintiff applied for and received his USSA membership online in December 2014.  Plaintiff admits that he received a confirmation email from USSA and that his credit card statement reflects a payment for his USSA membership. (Doc. 71-2 at 3.)  Though he does not remember whether he saw or acknowledged the release, Plaintiff has offered no evidence and asserted no specific facts to rebut Defendants' evidence that one cannot receive a USSA membership, as Plaintiff did, without first accepting the release. *See Fteja*, 841 F. Supp. 2d at 834, 841 (rejecting plaintiff's argument that forum selection clause was unenforceable because he did not remember agreeing to it); *see also Feldman*, 513 F. Supp. 2d at 236 ("Absent a showing of fraud, failure to read an enforceable click[-]wrap agreement, as with any binding contract, will not excuse compliance with its terms." (citations omitted)).  The court finds that no triable issue exists concerning Plaintiff's acceptance of the release.

## III.   Choice-of-Law Provision in Release

Plaintiff urges the court to disregard the Colorado choice-of-law clause in the release and apply Vermont law to the instant dispute.  Defendants submit that the court ought to apply Colorado law, as provided for in the parties' contract.

"The validity of a contractual choice-of-law clause is a threshold question that must be decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005) (citation omitted).  As this is a diversity action, the court looks to Vermont's choice-of-law rules to determine which law applies.  *See Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015) ("Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." (citations omitted)).

Exculpatory clauses in release agreements are evaluated under principles of contract law. *See Colgan v. Agway, Inc.*, 150 Vt. 373, 553 A.2d 143 (1988).  The Vermont Supreme Court has adopted the Restatement (Second) of Conflict of Laws (the "Restatement") for choice-of-law

---

consent. Any screenshot can be captured and printed, but printing the screen before acceptance does not demonstrate that acceptance is not required to join USSA.

questions in contract matters. *See McKinnon v. F.H. Morgan & Co., Inc.*, 170 Vt. 422, 423, 750 A.2d 1026, 1028 (2000) (citation omitted). Section 187 of the Restatement provides:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

  a. the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

  b. application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188,[3] would be the state of the applicable law in the absence of an effective choice of law by the parties.

The court finds that the issue before it, whether the exculpatory clause is valid or void under public policy, is not one which the parties could have resolved by an explicit provision in their agreement. It does not lie within their contractual capacity. *See* Restatement (Second) of Conflict § 187 cmt. d (noting that issues of contractual validity cannot be determined by explicit agreement). The court therefore considers the law specified in the release under § 187(2) of the Restatement, and finds that both exceptions to its application have been met.

---

[3] Section 188 of the Restatement provides, "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." The policy factors set out in § 6 include: (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied. With the exception of the protection of justified expectations, the court finds that the other factors either do not tip in any particular direction or favor the application of Vermont law.

A.      **No Substantial Relationship or Reasonable Basis Exception**

The chosen state of Colorado has no "substantial relationship" to the parties or the transaction. Plaintiff is a resident of New York. USSA is a Utah corporation and Okemo is a Vermont entity. The incident in question did not occur in Colorado. The only facts Defendants have offered in support of applying Colorado law to this case are: (1) Colorado is home to more USSA member clubs than any other state and hosts the majority of USSA's major events, and (2) there was a possibility that Plaintiff could have competed in Colorado at some point during the relevant ski season. The court finds that such a tenuous and hypothetical connection does not vest in the state of Colorado a substantial relationship to the parties or specific transaction at issue in this case. *See Rutherford ex rel. Rutherford v. Talisker Canyons Fin. Co.*, 2014 UT App 190, ¶ 24, 333 P.3d 1266.

In contrast, Vermont's relationship to the parties and transaction is significant. Okemo is a Vermont corporation, the competition was held in Vermont, Plaintiff was issued a lift ticket by Okemo requiring all disputes to be litigated in Vermont, Plaintiff participated in inspection and training runs in Vermont, and Plaintiff's injury occurred in Vermont.

Colorado has no substantial relationship to the parties or the transaction. Moreover, the minimal facts offered in support of the choice-of-law provision do not clearly establish a "reasonable basis" for choosing Colorado law. In any event, the court need not decide this issue because the choice-of-law provision also fails under the second exception to § 187(2) of the Restatement, as discussed below.

B.      **Public Policy Exception**

First, applying Colorado law would undoubtedly produce a result contrary to a fundamental policy of Vermont. Whereas exculpatory clauses in ski contracts have been held to be enforceable under Colorado law, *see, e.g., Brush v. Jiminy Peak Mountain Resort, Inc.*, 626 F. Supp. 2d 139, 149–51 (D. Mass. 2009) (applying Colorado law), courts applying Vermont law consistently hold such releases to be void as contrary to important public policies of the state. *See, e.g., Spencer v. Killington, Ltd.*, 167 Vt. 137, 702 A.2d 35 (1997); *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 670 A.2d 795 (1995).

7

Second, Vermont has a "materially greater interest" than Colorado in the determination of this issue.[4]  Colorado's interest in this case is minimal.  The fact that Plaintiff may have competed there in the course of the relevant ski season and that USSA hosts many events in that state does not create a significant interest in a case concerning a Vermont ski race.  Conversely, Vermont's interest is plain.  Vermont has a general interest in having its laws apply to contracts governing transactions taking place within the state.  Vermont also has a significant interest in the conduct at issue here.  Skiing is an important recreational activity for Vermonters and those visiting the state, and the Vermont Supreme Court has repeatedly noted its interest in holding ski resorts responsible for skier safety.  *See, e.g.*, *Spencer*, 167 Vt. at 140–43, 702 A.2d at 36–38 (ski race open to public implicates public interest and policy considerations); *Dalury*, 164 Vt. at 331–36, 670 A.2d at 797–800.  This court has specifically recognized Vermont's "special interest in this kind of litigation" given "the serious nature of the[se] claim[s] and the potential that future such events could result in injuries to Vermonters and visitors to the state." *Umali v. Mount Snow Ltd.*, 247 F. Supp. 2d 567, 572 (D. Vt. 2003).  As entities like USSA "will undoubtedly continue to sponsor and run events in Vermont," Vermont must "be able to regulate events like the race in question and to develop consistent and specific legal doctrine to protect both the mountain sports industry and its component parts, including its racing participants." *Id.*

The choice-of-law provision does not control in this case and we rely on Vermont law to determine the enforceability of the release.[5]

---

[4] As discussed previously, the court notes, pursuant to § 187(2)(b) of the Restatement, that Vermont would be the state of applicable law under § 188 in the absence of the choice-of-law provision given that it has the most "significant relationship" to the transaction and the parties.

[5] Defendants cite to *Stamp Tech, Inc. ex rel. Blair v. Lydall/Thermal Acoustical, Inc.*, 2009 VT 91, ¶ 23, 186 Vt. 369, 987 A.2d 292, as evidence that Vermont choice-of-law rules require Colorado law to be applied.  The court finds this argument unpersuasive.  In *Stamp Tech*, the Vermont Supreme Court noted that "[i]n the absence of a statute in the forum state providing otherwise, it is well-settled that it would be contrary to the justified expectations of the parties for a court to interpret their agreement by the laws of any jurisdiction other than that specified in the contract." *Id.* (citing Restatement (Second) of Conflict § 187 cmt. c).  However, that case involved an indemnification claim arising out of a contract for the installation of safety guards between two commercial parties.  *See id.* at ¶¶ 2–6.  The court does not read *Stamp Tech* as governing the enforceability of contractual provisions that waive an individual's right to sue a corporate entity for negligence.

**IV.     Release Void as Contrary to Vermont's Public Policy**

The leading Vermont Supreme Court case governing the enforceability of contract provisions waiving negligence claims is *Dalury v. S-K-I, Ltd.*, 164 Vt. 329, 670 A.2d 795 (1995). In *Dalury*, the Court rejected the exculpatory language in ski tickets issued to customers as being "contrary to public policy." *Id.* at 330, 670 A.2d at 796. The Court concluded that "ultimately the determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Id.* at 333–34, 670 A.2d at 798 (internal quotation marks and citation omitted). It then went on to make its public policy determination largely on the basis of two factors derived from the seminal case of *Tunkl v. Regents of University of California*, 383 P.2d 441 (Cal. 1963): (1) ski areas are open to the general public without regard to special training or ability, and (2) the longstanding rule that premises owners are in the best position to assure for the safety of their visitors.[6] *See Dalury*, 164 Vt. at 332–35, 670 A.2d at 797–99. As noted by this court in *Littlejohn v. TimberQuest Park at Magic, LLC*, 116 F. Supp. 3d 422, 426 (D. Vt. 2015), "[t]hese principles have remained unchanged in the cases which have followed *Dalury*."

In *Spencer v. Killington, Ltd.*, 167 Vt. 137, 702 A.2d 35 (1997), the Vermont Supreme Court considered whether a participant in an amateur ski race series was sufficiently different from the recreational skier in *Dalury* such that an exculpatory clause could be enforced against him. The Court ultimately held that the same public policy concerns underlying *Dalury* "appl[ied] with equal force" to the amateur ski racer. *Id.* at 142–43, 702 A.2d at 37–38. In so ruling, the *Spencer* Court relied on the same two principles it had emphasized in *Dalury*: (1) the race was open to the general public, including persons with limited or no experience in competitive skiing, and (2) the defendants, as opposed to the race participants, had:

> the expertise and opportunity to maintain and inspect their premises, to foresee and control hazards, to train their employees in risk management, to guard against the negligence of their agents and employees, and to insure against the risks and spread the increased cost of insurance among race participants or all skiing customers.

---

[6] In making its determination, the *Dalury* Court did not depend upon the *Tunkl* factor of whether skiing was an essential industry or service. The Court explained that "[w]hether or not [the ski resort] provide[s] an essential public service does not resolve the public policy question in the recreational sports context." *Dalury*, 164 Vt. at 334, 670 A.2d at 799.

*Id.* at 142, 702 A.2d at 37. The Court saw "no salient distinctions between [its case] and *Dalury*," *id.* at 143, 702 A.2d at 38, making clear that, under Vermont law, ski areas and sport event organizers will not be absolved from liability by virtue of an exculpatory clause even in the context of amateur racing.

While *Dalury* and subsequent cases identify other factors that courts might consider when weighing exculpatory clauses against public policy, those "most consistently applied" in cases resembling the instant matter continue to be "whether the defendant was in control of the location where the injury occurred" and "whether these premises were open to the general public." *Littlejohn*, 116 F. Supp.3d at 427. Here, the parties do not dispute that Defendants were in control of the premises. Rather, the parties focus their dispute on whether the race was open to the general public. While Plaintiff submits that it was, Defendants disagree. In support of their position, Defendants point out that individuals could only compete in the event if: (1) they had an active USSA membership, (2) they conducted both a visual inspection of the course and took at least two official training runs, and (3) they had proper ski equipment.

The court finds that, like the race in *Spencer*, the race here was open to the general public. While it is undisputed that a USSA membership was required to compete, any member of the public could register for such a membership, even on the day of the event. Being a USSA member is not exclusive nor does it require any level of skill. The organization consists of approximately 30,000 members. *Cf. Provoncha v. Vt. Motocross Ass'n*, 2009 VT 29, ¶ 20, 185 Vt. 473, 974 A.2d 1261 (exculpatory clause enforced where general public not permitted to race in motorcycling club's event and club consisted of only 300 members). The race was open to participants of varying skill levels, including beginners with no race experience, and anyone between the ages of eighteen and ninety. *See Umali*, 247 F. Supp. 2d at 574–75 (exculpatory release void as contrary to public policy where plaintiff competed in ski race open to participants of all skill levels). That all racers were required to conduct a visual inspection and take training runs before the competition does not change the court's analysis. As these pre-race measures took place on the same course as the event itself, it remains undisputed that skiers of all levels of ability could show up and get on the course without training elsewhere first. Lastly, while proper ski equipment was a necessary prerequisite, no specific racing gear was required. Rather, any participant with skis and a helmet would meet the eligibility requirements. In other words, all

barriers to entry were largely superficial. Nothing prohibited a novice skier from arriving at Okemo on the day of the race, signing up for a USSA membership, renting skis and a helmet, and having immediate access to the race course.

Though Defendants urge the court to enforce the exculpatory clause by citing two other Vermont Supreme Court cases, *Provoncha* and *Thompson v. Hi Tech Motor Sports, Inc.*, 2008 VT 15, 183 Vt. 218, 945 A.2d 368, the court finds these cases distinguishable. In *Thompson*, the Court held that a liability waiver signed by an individual injured during a motorcycle test ride did not contravene public policy.[7] *See* 2008 VT 15 at ¶ 7. In so doing, the Court specifically distinguished the premises liability concerns at issue in *Dalury*. The Court noted that "whereas public policy places the burden of maintaining safe premises on a landowner, public policy concerning motorcycle safety places the burden of safe driving on the operator of the motorcycle." *Id.* at ¶ 9. And unlike skiers who "are not in a position to discover and correct risks of harm" on a trail, a motorcycle test driver has "the ability to undertake precautions to avoid hazards associated with operation" and it was "logical to place the incentive for safe driving on the party who has actual control of the vehicle." *Id.* at ¶¶ 9, 12. *Provoncha* enforced an exculpatory clause in the motorcycling racing context, relying in large part on the fact that only members of a small motorcycling club were permitted to race in the event. *See* 2009 VT 29 at ¶ 20.

While it is true that this court in *Littlejohn* noted that the debate surrounding the enforceability of release agreements appeared to be split between recreational activities and "more risky pursuits" such as motorcycling, skydiving, scuba diving, and mountaineering, *see* 116 F. Supp. 3d at 428, the fact that the race at issue here was a high-risk activity does not automatically place it within the scope of *Thompson* and *Provoncha*. Those cases do not stand for the proposition that exculpatory waivers in the context of high-risk sports automatically satisfy public policy concerns. Instead, they note that such waivers are unlikely to contravene public policy because specialized, risky activities are commonly not open to all, but rather require special skill and prior experience, and frequently take place in settings that are not under the control of business operators. Neither of those things is true in this case. That the race at

---

[7] Though the agreement was consistent with public policy, the Court ultimately found that the release was insufficiently clear to exculpate the defendant from its own negligence. *See Thompson*, 2008 VT 15 at ¶¶ 16, 20.

issue here was a high-risk activity does not change the fact that it was also open to the general public and that Defendants, like those in *Dalury* and *Spencer*, not Plaintiff, were the ones with both the expertise and opportunity to inspect the premises and control for hazards.  If the court enforced the exculpatory clause at issue here, it would remove the incentive for Defendants to manage the risks posed by their ski areas and events to the general public, an outcome plainly contrary to the principles underlying *Dalury*.  *See Spencer*, 167 Vt. at 142, 702 A.2d at 37 ("[I]f defendants were permitted to obtain broad waivers of their liability, an important incentive for ski areas to manage risk would be removed, with the public bearing the cost of the resulting injuries." (quoting *Dalury*, 164 Vt. at 335, 670 A.2d at 799)).  As individuals engaged in recreational activities open to the general public in the state of Vermont continue to be entitled to expect that the activity will be made reasonably safe and that business owners will be responsible for the safety of their premises, the court will not enforce the exculpatory language of the release agreement on public policy grounds.

### Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. 58) is DENIED.

Dated at Rutland, in the District of Vermont, this 11th day of August, 2016.

Geoffrey W. Crawford, Judge
United States District Court